# United States Court of Appeals
## For the First Circuit

No. 22-1207

UNITED STATES,

Appellee,

V.

BERNARDITO CARVAJAL, a/k/a Christian Mendez-Acevedo,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. George A. O'Toole, Jr., U.S. District Judge]

Before

Kayatta, Lipez, and Rikelman,
Circuit Judges.

Eduardo Masferrer, Masferrer & Associates, P.C., with whom
Danya F. Fullerton was on brief, for appellant.
Randall E. Kromm, Assistant United States Attorney, with whom
Joshua S. Levy, Acting United States Attorney, and Hannah Sweeney
was on brief, for appellee.

October 26, 2023

**RIKELMAN**, **Circuit Judge**. After a jury convicted Bernardito Carvajal of possession with intent to distribute and distribution of fentanyl, the district court sentenced him to 120 months in prison. Carvajal appeals his sentence on two grounds. First, he argues the district court considered impermissible evidence, including conduct of which the jury acquitted him, in determining his sentence. Second, Carvajal contends the district court should have reduced his sentence based on his acceptance of responsibility at trial. Because controlling case law permits the consideration of acquitted conduct at sentencing and the record otherwise supports the district court's rulings, we affirm.

## I. Background

### A. Relevant Facts[1]

On June 13, 2019, police responded to a possible overdose at a home in Andover, Massachusetts. Upon entering the home, police discovered 26-year-old Richard Tonks unconscious in his bed, with an uncapped hypodermic needle next to his arm. Attempts to revive Tonks at the scene and later at a hospital failed.

The medical examiner for the Commonwealth of Massachusetts, Dr. Maria Del Mar Capo-Martinez, determined that Tonks died from "acute intoxication due to the combined effects of

---

[1] Because Carvajal does not challenge the sufficiency of the evidence supporting his conviction, we offer a "balanced" treatment of the facts. See United States v. Cox, 851 F.3d 113, 118 n.1 (1st Cir. 2017).

cocaine and fentanyl." Dr. Capo-Martinez performed an external examination of the body and tested blood and urine samples, which showed the presence of cocaine, fentanyl, and marijuana in Tonks's system. She did not conduct an internal examination or autopsy. Police also did not preserve or test the substance in the needle found next to Tonks.

Following Tonks's death, his family and girlfriend turned in to the police drug paraphernalia that they discovered in Tonks's room. This paraphernalia included two plastic bags, one of which proved to contain cocaine, and the other fentanyl.

They also turned in Tonks's cellphone, which contained Facebook and text messages that appeared to discuss drug transactions. The Facebook messages were between Tonks and a user named "Cmja MA," later identified as Carvajal. Tonks and Carvajal had been acquainted since at least 2018, when they were coworkers at a local restaurant, and the Facebook and text messages between them catalogued interactions from January to June of 2019. On January 23, 2019, Carvajal contacted Tonks to offer to sell him "white," which Tonks purchased.[2] Later that day, Tonks's girlfriend took him to the hospital, concerned that Tonks may have overdosed. Although Tonks told his girlfriend he had taken

---

[2] As discussed infra, the parties contested at trial whether "white" referred to cocaine or fentanyl.

cocaine, test results revealed he had only fentanyl and marijuana in his system.

A few months later, in April, Carvajal reached out to Tonks and offered to sell him more "white," but Tonks declined. In May, Carvajal once again offered "white" to Tonks, but Tonks did not respond until June 4, when he asked if Carvajal still had "white" to sell. Carvajal said he had "a little" and would get more the next day, and the two made plans to complete the transaction.

From June 5 to June 12, text messages show that Carvajal sold Tonks drugs almost daily, with increasing frequency until Tonks's death. Carvajal sold Tonks "1g" (one gram) of "white" twice on June 5, once on June 6, and once on June 9. On June 10, Tonks asked Carvajal to sell him a "3.5" "ball," apparently referring to an eighth of an ounce. On the morning of June 11, Tonks asked for "2 [grams] more," and a few hours later, asked if Carvajal was "around for another." That same evening, Tonks requested "one [gram] more for delivery," an amount he increased to "2" before the delivery occurred. On June 12, the day before Tonks died, Tonks contacted Carvajal for another "3.5" ball, and later added to the order "one brown." Carvajal made the sale.

On June 14, the day after Tonks was found dead, Carvajal texted Tonks "Hi you ok[?]" A few days later, Carvajal unfriended Tonks and Tonks's girlfriend on Facebook.

- 4 -

Further examination of Tonks's cellphone revealed that on June 9, 2019, four days before Tonks was found dead, Tonks texted a coworker looking to purchase "yayo," slang for cocaine. The coworker responded, "I'm not sure on that one, man." There were also phone calls between Tonks and the coworker on June 11 and 12.

On July 31, 2019, an Andover undercover police officer, aided by a Drug Enforcement Agency (DEA) task force, carried out a "buy-bust" operation targeting Carvajal. Via text message, the undercover officer set up a "white" purchase with Carvajal and arrested him once the transaction was complete. Subsequent testing revealed that the "white" Carvajal sold to the undercover officer was fentanyl. An examination of Carvajal's cellphone showed messages documenting transactions with other individuals for purchases of both "white" and "brown."

## B. Legal Proceedings

On January 29, 2020, a federal grand jury indicted Carvajal on two counts: distribution of fentanyl and cocaine on or about June 12, 2019, resulting in death, under 21 U.S.C. §§ 841(a)(1) & (b)(1)(c); and distribution of and possession with intent to distribute fentanyl on or about July 31, 2019, under 21 U.S.C, § 841(a)(1). Carvajal entered a plea of not guilty as to both counts.

The government's theory at trial was that Tonks died from an overdose of fentanyl and cocaine, and that Carvajal had sold Tonks both of those drugs in the days before his death. Accordingly, the government argued that Carvajal was responsible for Tonks's death.

As to the cause of death, the government offered the expert testimony of Dr. Capo-Martinez, the medical examiner, and Dr. Steven Bird, an emergency physician and medical toxicologist. Although Carvajal raised objections to Dr. Bird's testimony under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), the district court overruled his objections. Dr. Bird proceeded to testify that, in his medical opinion, the amount of fentanyl in Tonks's blood was sufficient to have caused Tonks's death, although he acknowledged that the combination of fentanyl and cocaine was "potentially lethal."

The government also introduced multiple forms of evidence to prove that Carvajal had sold Tonks both fentanyl and cocaine in the days leading up to his death. DEA Special Agent Glen Coletti testified that "white" is street slang for cocaine, and that the terms "ball," "eight ball," and "3.5" are slang for 3.5 grams of cocaine. By contrast, he explained, "brown" refers to heroin or fentanyl. The government offered this testimony in combination with the Facebook and text messages between Carvajal and Tonks, which documented these sales of "white" and "brown."

Carvajal, for his part, acknowledged that he sold drugs to Tonks (and to the undercover agent) but argued that the drugs he sold did not cause Tonks's death. He presented two main theories to dispute the government's case: (i) that Tonks had underlying health issues and died for reasons other than a drug overdose; and (ii) even if a drug overdose led to Tonks's death, Tonks died only because of the combination of cocaine and fentanyl in his system, and Carvajal did not sell him any cocaine. To support his arguments, Carvajal elicited testimony from Dr. Capo-Martinez that, absent an autopsy, she was unable to rule out other potential causes of death including heart attack, blood clot, or stroke. His expert witness at trial, Dr. Elizabeth Laposata, similarly opined that without an autopsy, the cause of death could not be conclusively determined. Finally, Carvajal challenged the testimony of Agent Coletti that "white" was slang for cocaine. On cross-examination, Carvajal secured an admission from Agent Coletti that he had previously testified that "white" is street slang for fentanyl, not cocaine. Given the ambiguous reference to "white" in the text messages, Carvajal contended, the jury could not find beyond a reasonable doubt that he had caused Tonks's death.

At the conclusion of the trial, the jury convicted Carvajal of distributing fentanyl under the first count but acquitted him of both distributing cocaine and causing Tonks's

death. The jury also convicted Carvajal of distributing fentanyl under the second count. The statute under which Carvajal was convicted, 21 U.S.C. § 841(a)(1), provided a maximum sentence of 20 years for each count. See 21 U.S.C. § 841(b)(1)(C).

The parties proposed substantially different sentences at the sentencing hearing. The probation office, in its pre-sentence investigation report ("PSR"), recommended an offense level of 24, with a criminal history category of I, resulting in a Guidelines sentence range of 51 to 63 months. The government requested a sentence of 120 to 144 months' imprisonment and three years' supervised release. Carvajal argued for a sentence of 36 months' imprisonment.

To support his proposed sentence, Carvajal contended that pursuant to U.S.S.G. § 3E1.1, he was entitled to a base offense reduction of two levels for acceptance of responsibility, based on his opening statement at trial. The two-level reduction would have brought him to a base offense level of 22 with a recommended Guidelines sentence of 41 to 51 months. Carvajal further argued for a downward variance from the lowest end of the Guidelines range, to justify his request for a 36-month sentence.[3]

---

[3] Carvajal, who is not a United States citizen and will be removed from the United States upon completion of his sentence, requested a six-month downward variance to account for an anticipated three to six months in immigration custody while his removal is processed.

The district court rejected the two-level reduction for acceptance of responsibility, however, relying on Section 3E1.1, Application Note 2, which provides that the reduction is available only in "rare situations" to defendants who proceed to trial. U.S.S.G. § 3E1.1 cmt. (n. 2). The court therefore adopted the base offense level of 24 calculated in the PSR, resulting in a Guidelines sentence range of 51 to 63 months.

The court also heard the government's argument that it should sentence Carvajal above the Guidelines range because a preponderance of the evidence established that Carvajal caused Tonks's death. The government pointed to the trial testimony of its witnesses and the text messages between Carvajal and Tonks to meet its burden of proof. Carvajal countered with his trial evidence challenging the government's theory on the cause of death. He also argued that the district court could not consider at sentencing conduct of which the jury had explicitly acquitted him.

The court ultimately held that the government had met its burden to establish by a preponderance of the evidence that the drugs Carvajal sold Tonks brought about Tonks's death. In particular, the court indicated that it found convincing Dr. Bird's testimony about the cause of death.

Having resolved the factual dispute about what caused Tonks's death, the district court proceeded to sentence Carvajal to 120 months' imprisonment and three years' supervised release.

The court began by discussing the 18 U.S.C. § 3553(a) factors used in determining a variance, and further noted that U.S.S.G. § 5K2.1, the departure Guideline, also allowed it to impose a sentence above the Guidelines range. The district court concluded that an upward variance or departure was "entirely appropriate" for an act that "was not an intentional homicide, but . . . was an intentional distribution of homicidal drugs." The following day, the district court issued its written Statement of Reasons and identified the sentence as a variance under § 3553(a) as opposed to a departure under Section 5K2.1.

Carvajal filed a timely notice of appeal on March 22, 2022. We have jurisdiction under 18 U.S.C. § 3231.

## II. Standard of Review

In sentencing appeals, we conduct a bifurcated review. United States v. Millán-Machuca, 991 F.3d 7, 27 (1st Cir. 2021). Initially, we consider whether the sentence is procedurally reasonable, "afford[ing] de novo review to the sentencing court's interpretation and application of the sentencing Guidelines, assay[ing] the court's factfinding for clear error, and evaluat[ing] its judgment calls for abuse of discretion." United States v. Ruiz-Huertas, 792 F.3d 223 (1st Cir. 2015). Carvajal's argument that his sentence violates constitutional guarantees of due process because it is based on acquitted conduct is also subject to de novo review. United States v. Sandoval, 6 F.4th 63,

- 10 -

115 (1st Cir. 2021).  Next, we turn to any arguments of substantive unreasonableness "under the abuse of discretion rubric, taking account of the totality of the circumstances."  Id.

### III. Discussion

### A. Procedural Reasonableness of Carvajal's Sentence

### 1. Acceptance of Responsibility

Carvajal contends that his opening statement at trial, in which he admitted that he sold drugs to Tonks and to an undercover officer, entitled him to a reduction in his base offense level for acceptance of responsibility.  Whether a defendant is eligible for this reduction is a factual question reviewed for clear error, and we will reverse the district court's ruling only if we are "left with a definite and firm conviction that a mistake has been committed."  United States v. McCarthy, 32 F.4th 59, 62-63 (1st Cir. 2022) (quoting Brown v. Plata, 563 U.S. 493, 513 (2011)).

United States Sentencing Guideline § 3E1.1(a) authorizes a two-level reduction in a defendant's base offense level if the defendant "clearly demonstrates acceptance of responsibility for his offense."  U.S.S.G. § 3E1.1(a).  "Defendants are not, however, automatically entitled to [the] reduction."  United States v. Garrasteguy, 559 F.3d 34, 38 (1st Cir. 2009).  To qualify for acceptance of responsibility, "a defendant must truthfully admit or not falsely deny the conduct comprising the conviction, as well

- 11 -

as any additional relevant conduct for which he is accountable." Id.; U.S.S.G. § 3E1.1, cmt. (n. 1(a)). The defendant bears the burden of proving that he accepted responsibility. See Garrasteguy, 559 F.3d at 38.

"When a defendant proceeds to trial and puts the government to its proof, a credit for acceptance of responsibility normally will not be available." United States v. Deppe, 509 F.3d 54, 60 (1st Cir. 2007). However, "in rare situations" and relying "primarily upon pre-trial statements and conduct," a reduction may still be warranted in such circumstances. Id.; U.S.S.G. § 3E1.1, cmt. (n. 2).

This is not one of those "rare situations." Carvajal points to the admissions in his opening statement at trial to support his argument regarding acceptance of responsibility. He contends that he had to wait until trial to make even these statements because, given the way he was charged, he could not admit to selling drugs to Tonks without also admitting to Tonks's death.

We are not persuaded. First, and most importantly, Carvajal offers no pre-trial statement or conduct whatsoever to support his acceptance of responsibility. We have found no case where a court upheld a reduction at sentencing based solely on statements made by a defendant at trial. And that is with good reason. The sentencing reduction exists in large part to encourage

defendants to plead guilty, when appropriate, to prevent the time and expense of "put[ting] the government to its proof." Deppe, 509 F.3d at 60; U.S.S.G. § 3E1.1, cmt. (n.2). At a minimum, Carvajal could have narrowed the issues here by pleading guilty, before trial, to the sale of drugs to the undercover officer and to the sale of fentanyl to Tonks, all without accepting criminal liability for Tonks's death. He made the decision not to do so, as was his constitutional right. But he cannot then claim to have demonstrated "full responsibility for his actions . . . candidly and with genuine contrition." United States v. Franky-Ortiz, 230 F.3d 405, 408 (1st Cir. 2000).

The district court did not clearly err in determining that Carvajal was not entitled to a two-level reduction for acceptance of responsibility.

## 2. Death Resulting from Drug Sales

We turn next to Carvajal's argument that the district court's erroneous consideration of acquitted conduct "drove" his sentence. As Carvajal forthrightly acknowledges, our current precedent makes clear that acquitted conduct can be considered at sentencing if the government proves it by a preponderance of the evidence. United States v. Meléndez-González, 892 F.3d 9, 19 (1st Cir. 2018) ("A district court may rely on acquitted conduct in sentencing 'so long as that conduct ha[s] been proved by a preponderance of the evidence.'") (quoting United States v. Martí-

Lón, 524 F.3d 295, 302 (1st Cir. 2008)); United States v. González, 857 F.3d 46, 58 (1st Cir. 2017) ("Indeed, a sentencing court may consider relevant conduct that constitutes another offense, even if the defendant has been acquitted of that offense, so long as it can be proven by a preponderance of the evidence.").

In light of our precedent, Carvajal advances two procedural arguments on this issue: (1) that consideration of the acquitted conduct violates constitutional guarantees of due process; and (2) that the district court clearly erred in finding by a preponderance of the evidence that Carvajal caused Tonks's death. After careful review, we conclude that Carvajal cannot prevail on either argument.

First, the United States Supreme Court has never prohibited the use of acquitted conduct at sentencing and has expressly upheld it in certain circumstances if the sentencing judge finds that the government has proved that conduct by a preponderance of the evidence. See United States v. Watts, 519 U.S. 148, 154 (1997) (per curiam) (holding that use of acquitted conduct at sentencing does not offend the Double Jeopardy Clause). Carvajal is correct that numerous federal and state judges have written that this practice violates both the Fifth Amendment's Due Process Clause and the Sixth Amendment's right to a jury trial, as well as similar provisions in state constitutions. See e.g., Jones v. United States, 574 U.S. 948, 948 (2014) (Scalia, J., joined by

Thomas & Ginsberg, JJ., dissenting from denial of certiorari) (arguing that the imposition of "sentences that, but for a judge-found fact, would be reversed for substantive unreasonableness" had "gone on long enough"); United States v. Magee, 834 F.3d 30, 38 (1st Cir. 2016) (Torruella, J., concurring) ("[I]t is constitutionally suspect to drastically increase a defendant's sentence based on conduct that was neither proven beyond a reasonable doubt nor to which the defendant plead guilty."); United States v. Bell, 808 F.3d 926, 929 (D.C. Cir. 2015) (Millett, J., concurring in denial of rehearing en banc) ("[A]llowing a judge to dramatically increase a defendant's sentence based on jury-acquitted conduct is at war with the fundamental purpose of the Sixth Amendment's jury-trial guarantee."); cf. State v. Cote, 530 A.2d 775, 785 (N.H. 1987) (explaining that criminal defendants are entitled to "full benefit" of the presumption of innocence, a benefit that "is denied when a sentencing court may have used charges that have resulted in acquittals to punish the defendant").

Indeed, the Supreme Court has indicated it may soon take up this issue and re-examine its earlier precedent. See McClinton v. United States, 143 S. Ct. 2400, 2403 (2023) (Sotomayor, J., respecting the denial of certiorari) ("The Sentencing Commission, which is responsible for the Sentencing Guidelines, has announced that it will resolve questions around acquitted conduct sentencing in the coming year. If the Commission does not act expeditiously

or chooses not to act, however, this Court may need to take up the constitutional issues presented."). But unless and until the Supreme Court does so, or the Sentencing Commission revises the Guidelines, we are bound to follow our controlling precedent and must reject Carvajal's due process challenge.

Second, a careful review of the record shows no clear error in the district court's finding, by a preponderance of the evidence, that Carvajal caused Tonks' death. The relevant federal sentencing statute compels us to "accept a district court's findings of fact (unless clearly erroneous), but also to give due deference to the district court's application of the Guidelines to the facts." United States v. Andino-Morales, 73 F.4th 24, 43 (1st Cir. 2023) (quoting Buford v. United States, 532 U.S. 59, 63 (2001)) (internal quotations omitted); see also 18 U.S.C. § 3742(e). At sentencing, the district court has discretion to "consider any evidence with sufficient indicia of reliability, and can rely upon 'virtually any dependable information.'" United States v. Ford, 73 F.4th 57, 64 (1st Cir. 2023) (quoting United States v. Berríos-Miranda, 919 F.3d 76, 81 (1st Cir. 2019)). Moreover, it is the sentencing court's unique "responsibility to make credibility determinations about witnesses." United States v. Nagell, 911 F.3d 23, 31 (1st Cir. 2018). Our clear error standard is "demanding," and we reverse only if, viewing the record in its entirety, we are left with "a strong, unyielding belief

that a mistake has been made." United States v. Nuñez, 852 F.3d 141, 144 (1st Cir. 2017).

Carvajal argues that the district court erred by improperly weighing the competing expert testimony. He disagrees with how the district court characterized the three expert witnesses: Dr. Bird as "the most reliable because he was more exhaustive in his analysis"; Dr. Laposata as "not very helpful"; and Dr. Capo-Martinez as "helpful but cautious in not going beyond what her evidence indicated to her." In Carvajal's view, because Dr. Bird is a medical toxicologist and not a medical examiner, the district court should have discounted his testimony that fentanyl alone could have caused Tonks's death. He further argues that Dr. Bird's testimony improperly relied on postmortem blood concentrations.[4] However, weighing the credibility of expert testimony is exactly the sort of factfinding that falls within the purview of the district court. Cf. United States v. Jones, 187 F. 3d 210, 214 (1st Cir. 1999) ("Where evaluations of witnesses' credibility are concerned, we are especially deferential to the district court's judgment . . . .").

---

[4] Carvajal also suggests that the district court's comments may be the result of gender bias. Although discounting witness testimony due to gender bias is inappropriate and could constitute clear error, Carvajal's only evidence of gender bias is that both Dr. Capo-Martinez and Dr. Laposata are women. This kind of bare assertion cannot support a finding of clear error. See Nuñez, 852 F.3d at 144.

Carvajal also argues that the district court's reliance on Dr. Bird's testimony is doubly erroneous given his Daubert challenge to that testimony. However, Carvajal has not briefed the merits of his Daubert challenge on appeal and thus has waived that argument. United States v. Mayendía-Blanco, 905 F.3d 26, 32 (1st Cir. 2018) ("[I]t is a well-settled principle that arguments not raised by a party in its opening brief are waived.").[5]

In any event, there is no indication that this expert testimony was the sole basis for the district court's finding that Tonks's death resulted from Carvajal's conduct. The record contains substantial evidence supporting the finding that Carvajal supplied Tonks with both cocaine and fentanyl and thus caused his death. According to the testimony of Agent Coletti, the text messages between Carvajal and Tonks show that Carvajal sold Tonks "white," a "ball," and "3.5," which are all slang for cocaine, as well as "brown," which is slang for fentanyl. Agent Coletti also testified that the prices Carvajal quoted to Tonks for "white" were consistent with the street price of cocaine. Tonks's girlfriend further testified that Tonks was primarily using cocaine, and that Tonks initially thought that his January 2019 overdose, a few months before his death, was due to cocaine.

---

[5] Further, rulings on Daubert challenges are reviewed for abuse of discretion, and we see no abuse of discretion in allowing Dr. Bird, who is trained and educated in emergency medicine and medical toxicology, to testify about what caused Tonks's death.

Although the jury concluded that the government had failed to prove beyond a reasonable doubt that Carvajal caused Tonks's death, at sentencing the district court was evaluating this proof under the less demanding preponderance of the evidence standard. See Martí-Lón, 524 F.3d at 302; see also Andino-Morales, 73 F.4th at 43 ("'[T]he argument for deference peaks when,' as here, 'the sentencing judge has presided over a lengthy trial and is steeped in the facts of the case.'") (quoting United States v. Sepulveda, 15 F.3d 1161, 1200 (1st Cir. 1993)).

The record plausibly supports the district court's finding by a preponderance of the evidence that Carvajal caused Tonks's death, and we therefore discern no clear error.[6]

---

[6] Carvajal also asserts that the district court improperly applied the Section 5K2.1 Guideline departure, including by not imposing a "but for" causation standard when it evaluated the evidence about whether Carvajal's conduct caused Tonks's death. As we explain in Section C, infra, the district court imposed a variance pursuant to 18 U.S.C. § 3553(a), and not a Guideline departure under Section 5K2.1.

## B. Substantive Reasonableness of Carvajal's Sentence[7]

We turn next to Carvajal's challenge to the substantive reasonableness of his 120-month sentence. See Gall v. United States, 552 U.S. 38, 51 (2008). "A sentence is substantively unreasonable only if it lacks 'a plausible sentencing rationale' or 'a defensible result.'" United States v. Millán-Machuca, 991 F.3d 7, 27 (1st Cir. 2021) (quoting United States v. Martin, 520 F.3d 87, 96 (1st Cir. 2008)). There is no presumption that a sentence outside of the Guidelines range is unreasonable, even when the extent of the upward variance is substantial. United States v. Flores-Machicote, 706 F.3d 16, 25 (1st Cir. 2013). We "consider the substantive reasonableness of the sentence imposed under an abuse-of-discretion standard," but must also afford "due deference to the district court's decision that the § 3553(a) factors, on a whole, justify the extent of the variance." Gall, 552 U.S. at 51.

Carvajal argues that the extent of the variance here functionally punishes him not for his offense of conviction,

---

[7] The government maintains that Carvajal waived his right to advance these arguments by "including [them] as an afterthought in a section addressing other issues, not as a freestanding claim." We disagree. Carvajal developed these arguments over five pages and supports them with legal authority. The in-circuit case cited by the government, United States v. Sayer, is inapposite. 748 F.3d 425, 436 (1st Cir. 2014) (rejecting defendant's vagueness claim as waived where it was addressed in only a few sentences, and given no distinct legal analysis). We proceed to the merits.

selling fentanyl, but for his acquitted conduct, causing Tonks's death.  In particular, relying on our decision in United States v. Lombard, Carvajal argues that the upward variance imposed by the district court is constitutionally suspect because the related conduct represents such a grossly disproportionate share of his total sentence that it violates his Fifth and Sixth Amendment rights.  72 F.3d 170, 176-183 (1st Cir. 1995).

We disagree.  Lombard was "an extreme case," even "an unusual and perhaps singular case," that we held "was at the boundaries of constitutional sentencing law."  Id. at 187.  The defendant in Lombard was convicted of a firearms offense that had no statutory maximum sentence.  Id. at 177.  In evaluating the appropriate sentence, the district court considered it relevant that the firearms in question were used in two murders, crimes of which Lombard had been acquitted in state court.  Id. at 174-75. The district court applied a provision of the sentencing Guidelines that required it to calculate the defendant's base offense level "as if his offense of conviction had been murder."  Id. at 182. As a result, instead of 262 to 327 months' incarceration, the Guidelines required a life sentence without parole.  Id.  We held that "[g]iven the magnitude of the sentence 'enhancement,' the seriousness of the 'enhancing' conduct in relation to the offense of conviction, and the seemingly mandatory imposition of the life

sentence,"[8] the Constitution demanded resentencing.  Id. at 180. However, we took pains to explain that "[a]bsent [these] special circumstances . . . no comparable concerns would be raised by cases involving even sizeable sentence increases" on the basis of "uncharged or acquitted conduct."  Id. at 186-87.  Indeed, we have rejected challenges based on Lombard in less extreme factual circumstances.  See e.g., González, 857 F.3d at 58 (rejecting an argument under Lombard that a sentence at the statutory maximum for the crime (120 months) implicated due process concerns); United States v. Sandoval, 6 F. 4th 63, 115 (1st Cir. 2021) (rejecting a Lombard argument for a sentence within the Guidelines range).

The facts here are clearly distinguishable from those in Lombard.  Far from being "the harshest penalty outside of capital punishment," Lombard, 72 F.3d at 177, Carvajal's ten-year sentence is still well below the statutory maximum of twenty years for his crime of conviction, even though it falls outside the recommended Guidelines range.  See 21 U.S.C. § 841(b)(1)(C).  Unlike in Lombard, the district court did not sentence Carvajal "as if" his offense of conviction were death resulting from fentanyl distribution.  If it had, the sentencing range would have been a

---

[8] Lombard was decided before United States v. Booker, 543 U.S. 220, 245 (2005), clarified that the Sentencing Guidelines are advisory.  Indeed, the district court's failure to "recognize its authority to consider whether a downward departure [from the life sentence] would have been appropriate" was central to our analysis.  Lombard, 72 F.3d at 187.

minimum of twenty years to a maximum of life imprisonment. 21 U.S.C. § 841(b)(1)(C). In sum, Carvajal's sentence does not present the same extraordinary circumstances that so concerned us in Lombard.

Trying another tack, Carvajal argues that the district court abused its discretion in citing the need for deterrence as a reason for the upward variance because sentences within the Guidelines range already account for appropriate deterrence. In support of this position, Carvajal cites United States v. Ofray-Campos, 534 F.3d 1, 43 (1st Cir. 2008). In the section of Ofray-Campos that Carvajal relies on, we struck down a forty-year sentence that was twenty-four years longer than the maximum sentence recommended under the Guidelines. Id. at 42. We explained that in such a case, "the district court must offer an especially compelling reason for its sentence." Id. at 43. The district court had based its variance, in part, on the defendant's possession of "powerful weapons," which we explained "had already been considered, and accounted for, in the two-level enhancement applied in the calculation of Appellant's adjusted offense level." Id.; see also United States v. Zapete-Garcia, 447 F.3d 57, 60 (1st Cir. 2006) ("When a factor is already included in the calculation of the Guidelines sentencing range, a judge who wishes to rely on that same factor to impose a sentence above or below the range must articulate specifically the reasons that this particular

- 23 -

defendant's situation is different from the ordinary situation covered by the Guidelines calculation.").

Our reasoning in Ofray-Campos does not apply here. The district court accepted the offense level proposed in the PSR, which explicitly did not treat Carvajal as responsible for Tonks's death. Accordingly, there is no overlap between the variance factors considered by the district court and the factors "included in the calculation of the Guidelines sentencing range." Zapete-Garcia, 447 F.3d at 60. Continuing to cite Ofray-Campos, Carvajal further contends that his case poses no more need for deterrence than does any other drug sale case. Although there is a need for deterrence in all drug cases, not all drug sales result in an individual's death from a drug overdose, as the district court found by a preponderance of the evidence occurred here.

Carvajal next asserts that his ten-year sentence is "unreasonably high" given that we "found a sentence of 60 months reasonable for selling fentanyl that caused a death," citing United States v. Heindenstrom, 946 F.3d 57, 64 (1st Cir. 2019). Left out of Carvajal's argument is that the Guidelines range, the starting point of any departure or variance analysis, was significantly lower in Heindenstrom, 8 to 14 months, compared to the 51 to 63 months here. Id. at 61. Although on an absolute basis Carvajal's sentence is twice as long as the sentence in Heindenstrom, on a percentage basis Carvajal's variance is less extreme than the

- 24 -

variance in <u>Heindenstrom</u>.  <u>Id.</u>  Specifically, in <u>Heindenstrom</u>, we approved an upward variance that resulted in a sentence more than four times the maximum recommended by the Guidelines.  <u>Id.</u> Carvajal's sentence is less than double the maximum recommended by the Guidelines.

Concluding that Carvajal's sentence was neither implausible nor indefensible, we find that it is substantively reasonable.  <u>Millán-Machuca</u>, 991 F.3d at 28.

## C. Departure or Variance?

Finally, we briefly discuss Carvajal's argument that the district court improperly imposed an upward departure pursuant to U.S.S.G. § 5K2.1. As we noted, initially at the sentencing hearing "the district court couched its sentence both as an upward departure and as an upward variance."  <u>Heindenstrom</u>, 946 F.3d at 61.  A "departure . . . is a term of art under the Guidelines and refers only to non-Guidelines sentences imposed under the framework set out in the Guidelines."  <u>United States</u> v. <u>Aponte-Vellón</u>, 754 F.3d 89, 93 (1st Cir. 2014) (quoting <u>Irizarry</u> v. <u>United States</u>, 553 U.S. 708, 714 (2008)).  In contrast, a variance "result[s] from a court's consideration of the statutory sentencing factors enumerated in 18 U.S.C. § 3553(a)."  <u>Id.</u>

We have held that when a district court discusses the § 3553(a) factors and "ultimately rest[s] its rationale on the nomenclature of a § 3553(a) variance," the court has imposed a

- 25 -

variance, even if it "previously used language that signaled an intent to make a departure." United States v. Santini-Santiago, 846 F.3d 487, 490 (1st Cir. 2017). Moreover, it is harmless error for the district court to invoke a departure guideline if it "would have imposed exactly the same sentence [as] a variance." Heindenstrom, 946 F.3d at 62; see also United States v. Fletcher, 56 F.4th 179, 188 (1st Cir. 2022) (upholding a sentence enhancement where "[i]n explaining its reasoning for the departure, the district court effectively made clear that it would have issued the same sentence under the rubric of a variance").

Here, we are persuaded the district court imposed a variance. Although the court did discuss the departure guideline during the sentencing hearing, it also discussed many of the factors that underlie a variance, including the seriousness of the offense, 18 U.S.C. § 3553(a)(2)(A), the need to effectively deter criminal conduct, id. § 3553(a)(2)(B), and the impact on family members, see id. § 3553(a)(1). Moreover, the district court explicitly indicated in its written Statement of Reasons that it was imposing a variance rather than a departure. "[S]entenc[ing] in this manner is the hallmark of a variance." Santini-Santiago, 846 F.3d at 491. Even if Carvajal were correct, and the district court did impose a Section 5K2.1 departure, "we need not inquire into the bona fides of the upward departure" when it is clear the

court would have imposed the same sentence as a variance. Heindenstrom, 946 F.3d at 62.

## IV. Conclusion

For all these reasons, we **<u>affirm</u>** the district court.