# United States Court of Appeals
## For the First Circuit

No. 24-1809

UNITED STATES OF AMERICA,

Appellee,

v.

LI WEN TANG, a/k/a Tony Tang,

Defendant, Appellant.


APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nathaniel M. Gorton, U.S. District Judge]


Before

Montecalvo, Lynch, and Thompson,
Circuit Judges.


Daniel N. Marx and Fick & Marx LLP on brief for appellant.

Mark T. Quinlivan, Assistant United States Attorney, and Leah B. Foley, United States Attorney, on brief for appellee.


November 26, 2025

**LYNCH**, <u>Circuit Judge</u>.  Li Wen Tang appeals from his concurrent 78-month sentences -- sentences at the bottom of the applicable Guidelines range -- imposed after he pled guilty to two counts of Hobbs Act robbery and aiding and abetting, in violation of 18 U.S.C. §§ 2, 1951.  Tang pled guilty to two robberies, committed roughly an hour apart with co-defendants Jonas Nunez and Alfeu Barbosa, at massage businesses in Brookline and Stoneham, Massachusetts.  Tang's appeal challenges the sentencing court's application of firearm enhancements: a six-level increase as to the Brookline robbery and a five-level increase for the Stoneham robbery.  His attacks focus largely on whether the government proved by a preponderance of the evidence that his co-defendants' use of firearms was reasonably foreseeable to him, and they rest in part on mistaken legal assumptions.  We affirm Tang's sentence.

## I.

Because Tang has largely preserved his procedural sentencing challenges,[1] we review for abuse of discretion.  <u>See</u> <u>United States</u> v. <u>González-Santillan</u>, 107 F.4th 12, 17 (1st Cir. 2024).  We review the district court's factual findings supporting the application of the enhancements for clear error.  <u>See</u> <u>id.</u>  To the extent Tang challenges the district court's interpretation or application of the Guidelines, our review is de novo.  <u>See</u> <u>id.</u>

---

[1] Tang's appellate briefings appear to raise one unpreserved argument, which we address <u>infra</u> note 7.

**A.**

As Tang pled guilty, "we draw the facts from 'the change-of-plea colloquy, the presentence investigation report ("PSR"), and the sentencing record.'" United States v. De La Cruz, 91 F.4th 550, 551 (1st Cir. 2024) (quoting United States v. Diaz-Serrano, 77 F.4th 41, 44 (1st Cir. 2023)). Here, the sentencing record includes testimony from the trial of co-defendant Barbosa. See United States v. Fígaro-Benjamín, 100 F.4th 294, 301-03 (1st Cir. 2024) (permitting a sentencing court to consider testimony given at the trial of a co-defendant where, as here, the same judge had presided over both proceedings and where the defendant had adequate notice that the testimony would be used at his sentencing hearing).

On the evening of June 12, 2022, Nunez drove Tang to a location near the Balance Reflexology Spa in Brookline, Massachusetts, where they picked up Barbosa and then parked on a side street. Shortly before 8:45 p.m., Tang entered the spa, where he met Jin Zhang, the only employee working that night. After asking for an hour-long massage, Tang went to the restroom. When he returned, he paid for the service and asked Zhang whether anyone else was working. She told him untruthfully that another employee was there. Tang asked to see her; Zhang replied that the other employee was busy. She then led Tang into a treatment room.

Zhang was prepared to begin the massage when Tang said he needed to use the restroom again. Tang communicated with his

- 3 -

co-defendants over text during these trips. While he was gone, Zhang locked the spa's front door. When she reentered the treatment room, Tang told her that he no longer wanted the massage and asked for his money back. They walked to the lobby so Zhang could call her boss for approval. Tang had received two texts from Nunez reporting that the door was locked, and after Zhang placed the call to her boss, Tang unlocked the front door.

Nunez and Barbosa entered through the unlocked door, each carrying a handgun. One of them knocked Zhang's cellphone to the ground and struck her in the face with one hand while pointing his gun at her head with the other hand. This same person dragged her by the hair to the back of the spa, demanding to know where the money was. Zhang showed them where the money was kept, and the men took about $500. They duct taped her face, ankles, hands, and wrists, ransacked the spa, took her phone, and left.

Tang, Nunez, and Barbosa proceeded to the second target: May's Spa in Stoneham. Barbosa contacted his associates, three of whom met the group on a street near May's. Around 10 p.m., Nunez, Barbosa, and one of Barbosa's associates entered the spa. Nunez and Barbosa again carried handguns, which they pointed at the occupants of the spa while demanding money. The men bound all six victims and took about $1,100 and three cellphones before leaving.

On August 10, 2022, Boston police pulled over Nunez, whose car had been linked to the robberies. A search of the car

uncovered an M&P .40-caliber magazine loaded with six rounds in the glove compartment. The next day, FBI agents executing a search at Nunez's apartment recovered a Smith & Wesson safety and instruction manual.

At a hearing on April 3, 2024, Tang pled guilty to the two counts described earlier. In response to the prosecutor's proffer of evidence, Tang stated in part that he "did not have any personal knowledge that a firearm was used during the course of the crimes" and further that he "did not see anybody pull out a gun." The prosecutor replied that these disagreements did not affect the elements of the crime alleged, and the district court accepted Tang's guilty plea.

**B.**

On March 11, 2024, after Tang had pled guilty but before he was sentenced, Barbosa's jury trial began. Nunez had already pled guilty. The same judge who took Tang's plea and would later sentence him also presided over Barbosa's trial. We recount the relevant testimony.

Nunez testified pursuant to a cooperation agreement with the government. He met Tang several months before the Brookline and Stoneham robberies, while playing in local poker games. He began driving Tang not only to those games but afterward to private homes and apartments where Tang robbed "behind-the-scenes sexual massage" businesses run by Tang's former employer. After several

such trips, Tang offered to pay Nunez to participate, stating "nobody's going to get hurt." Tang said he knew the layout and that he would distract the woman providing the services while Nunez would go in and retrieve the money. Nunez agreed and, while at first unarmed, he began carrying his small black semiautomatic handgun, kept unloaded, during the robberies after Tang told him to "bring a firearm, just to intimidate."

Nunez testified at Barbosa's trial that on June 12, 2022, he picked up Tang and drove to a Brookline address that Tang provided, where Tang said a "friend" would join them to help rob a massage business. When they arrived near that location, a man Nunez had not met before -- later identified as Barbosa -- got into the back seat. Nunez recalled that Barbosa had a "[h]andgun, semiauto, black." The men agreed that Tang would pose as a customer and text Nunez when to enter. Zhang, the Brookline victim, testified that when Tang unlocked the front door, "two guys came in with two guns" and "pointed [them] to my head."

Nunez testified at Barbosa's trial that Tang said he had "something else set up" after the disappointing take. He further testified at Barbosa's trial that Tang gave the address of the Stoneham spa, shared information to assist in the robbery, and let him and Barbosa know they would need "extra people for this one."

Chunjie Li, the spa's owner, testified that three masked men "rushed in" with "two guns" pointed at the spa's occupants,

including at her head. Li's friend, Arthur Fraas, testified that one of the men, who wore a patterned hooded jacket,[2] pointed a "black stainless steel gun" at him, pushed him down, and demanded money. Fraas, a licensed gun owner, said he was "petrified" because "the man almost shot me" and "I could have died."

## C.

The PSR set a base offense level of twenty for each count of robbery under U.S.S.G. § 2B3.1(a).[3] Probation added six levels for the Brookline robbery under § 2B3.1(b)(2)(B) because Tang's co-defendants "otherwise used" firearms by pointing them at the victim's head, five levels for the Stoneham robbery under § 2B3.1(b)(2)(C) because the men "possessed" firearms, and two levels for each robbery under § 2B3.1(b)(4)(B) because they physically restrained the victims. The enhancements produced adjusted offense levels of 28 and 27, respectively. After a two-level multiple-count adjustment and a three-level reduction for acceptance of responsibility, the total offense level was 27. With a criminal history category of II, the Guidelines range was 78 to

---

[2] Fraas's description of the gunman's clothing was consistent with still images depicting Barbosa that night, taken from exterior video surveillance footage maintained by the management of the building where the Brookline spa was located. The footage captured the sidewalk in front of the spa, and Nunez identified himself and Barbosa in stills. The images show Nunez wearing a black sweater and Barbosa a lighter-colored, patterned sweatshirt.

[3] All references to the Guidelines refer to the 2022 edition.

97 months' imprisonment.

Tang objected to the PSR's application of both firearm enhancements. As to the six-level enhancement for the Brookline robbery, he argued that the government had not shown by a preponderance of the evidence that it was "reasonably foreseeable" to him that a co-defendant would "possess[]" or "otherwise use" a firearm during the offense. Tang asserted that Nunez's testimony was not credible, that he had never asked Nunez to bring a gun or knew he would, and that no other evidence supported foreseeability. He also argued that, because no gun was ever recovered or tested, the government could not prove that the weapons met the Guidelines' definition of a "firearm." Tang raised the same objections to the five-level enhancement for the Stoneham robbery. The Probation Office responded that both firearm enhancements had been properly applied.

Tang's sentencing memorandum renewed his objections, adding that robbing a massage parlor was not the type of offense in which violence was expected or resistance likely and that he would have known, given his alleged personal knowledge of the Brookline and Stoneham spas, that even an unloaded gun was unnecessary. Without the firearm enhancements, Tang calculated his Guidelines range to be 41 to 51 months' imprisonment and sought a downward variance to 30 months.

The government, in its sentencing memorandum, argued

that Tang's objections to the PSR were without merit and that both firearm enhancements were properly applied. It recommended a sentence of 87 months' imprisonment followed by three years of supervised release.[4]

At the sentencing hearing, the district court ruled that the enhancements applied were proper.[5] As to the six-level enhancement for the Brookline robbery, the district court found:

> [C]ertainly by a preponderance of the evidence [there] is sufficient evidence for this [c]ourt to determine that it was reasonably foreseeable to [Tang] that a gun would be used, a firearm, and not some other nondescript dangerous weapon. . . . The defendants did do more than simply brandish that firearm at the first robbery. Holding a gun to one's head is about as close to otherwise using a firearm as anything I can imagine.

As to the five-level enhancement for the Stoneham robbery, the district court found that a firearm "was certainly present and/or brandished" and that this was reasonably foreseeable to Tang because "the fact that the guns were used at the first robbery . . . put [him] on notice" that they would again be used at the second robbery a short while later.

Consistent with the PSR, the district court determined

---

[4] In supplemental sentencing memoranda, the parties further addressed whether the unloaded handgun that Nunez "otherwise used" at the Brookline robbery should be classified as a "firearm" or a mere "dangerous weapon" under the Guidelines.

[5] The district court had before it the PSR, the parties' sentencing and supplemental memoranda, and Tang's letters to the court.

Tang's total offense level to be 27, his criminal history category to be II, and his Guidelines range to be 78 to 97 months' imprisonment. The district court imposed a sentence of 78 months' imprisonment followed by three years of supervised release.

## II.

On appeal, Tang largely repeats his arguments as to the firearm enhancements: He contends that the district court clearly erred in finding that a preponderance of the evidence showed it was reasonably foreseeable to him that Nunez or Barbosa would "possess" or "brandish" a firearm at either robbery or would "otherwise use" a firearm at the Brookline robbery. He also contends that the district court clearly erred in finding that a preponderance of the evidence showed that Nunez and Barbosa carried "firearms" as that term is defined in the Guidelines.

## A.

"[F]actual findings made at sentencing must be supported by a preponderance of the evidence." United States v. Ramirez-Ayala, 101 F.4th 80, 87 (1st Cir. 2024) (alteration in original) (quoting United States v. Colón-De Jesús, 85 F.4th 15, 21 (1st Cir. 2023)). "In making these findings, sentencing courts may depend upon any 'relevant information regardless of admissibility at trial . . . provided it has sufficient indicia of reliability to support its probable accuracy.'" Id. (omission in original) (some internal quotation marks omitted) (quoting United States v.

- 10 -

Lee, 892 F.3d 488, 492 n.4 (1st Cir. 2018)). This gives the court "considerable leeway to rely upon 'virtually any dependable information.'" Fígaro-Benjamín, 100 F.4th at 301 (quoting United States v. Berrios-Miranda, 919 F.3d 76, 80 (1st Cir. 2019)). That leeway extends to the court's consideration of credible testimony from a co-defendant's trial so long as the defendant had adequate notice that such testimony would be used at his sentencing. See id. Tang does not argue absence of adequate notice and indeed his own sentencing memorandum used that testimony. A sentencing court commits procedural error when it "select[s] a sentence based on clearly erroneous facts." Ramirez-Ayala, 101 F.4th at 87 (quoting Gall v. United States, 552 U.S. 38, 51 (2007)).

**B.**

The Guidelines provide that when the offense of conviction is robbery, a defendant's offense level increases according to the nature and degree of weapon involvement: "(A) If a firearm was discharged, increase by **7** levels; (B) if a firearm was otherwise used, increase by **6** levels; [and] (C) if a firearm was brandished or possessed, increase by **5** levels." U.S.S.G. § 2B3.1(b)(2). If the weapon was not a "firearm" but a "dangerous weapon," the corresponding increases are 4 and 3 levels for "otherwise us[ing]" or "brandish[ing] or possess[ing]" it. Id. § 2B3.1(b)(2)(D)-(E).

A "firearm" includes any weapon "which will or is

- 11 -

designed to or may readily be converted to expel a projectile by the action of an explosive," "the frame or receiver of any such weapon," "any firearm muffler or silencer," or "any destructive device."  Id. § 1B1.1, cmt. n.1(H).  By contrast, a "dangerous weapon" is "an instrument capable of inflicting death or serious bodily injury" or an object that "closely resembles" such an instrument or was used in a manner that "created the impression" it was one.  Id. § 1B1.1, cmt. n.1(E).

A firearm is "brandished" when "all or part of [it] was displayed, or the presence of [it] was otherwise made known to another person, in order to intimidate that person."  Id. § 1B1.1, cmt. n.1(C).  A firearm is "otherwise used" when "the conduct did not amount to the discharge of [the] firearm but was more than brandishing, displaying, or possessing [it]."  Id. § 1B1.1, cmt. n.1(J).

A defendant may also be held accountable at sentencing for "relevant conduct."  See id. § 1B1.3.  "[I]n the case of a jointly undertaken criminal activity" -- which includes a "criminal plan [or] scheme . . . undertaken by the defendant in concert with others, whether or not charged as a conspiracy" -- the relevant conduct of the defendant includes "all acts and omissions of others that were (i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that

criminal activity." Id. § 1B1.3(a)(1)(B). The relevant conduct guideline commentary provides a specific example:

> [T]wo defendants agree to commit a robbery and, during the course of that robbery, the first defendant assaults and injures a victim. The second defendant is accountable for the assault and injury to the victim (even if the second defendant had not agreed to the assault and had cautioned the first defendant to be careful not to hurt anyone) because the assaultive conduct was within the scope of the jointly undertaken criminal activity (the robbery), was in furtherance of that criminal activity (the robbery), and was reasonably foreseeable in connection with that criminal activity (given the nature of the offense).

Id. § 1B1.3, cmt. n.3(D). Tang does not dispute that his co-defendants' actions were within the scope and in furtherance of their jointly undertaken criminal activity.

## C.

Tang argues instead that the district court erred in finding that a preponderance of the evidence showed it was reasonably foreseeable to Tang that his co-defendants would "possess" or "otherwise use" firearms at either robbery.

That finding is well supported by the record. For example, it is supported by Nunez's testimony. Tang's instruction to Nunez to bring a gun to earlier robberies "to intimidate" supports that Tang expected Nunez to continue doing so, and Barbosa, as well. See United States v. Balsam, 203 F.3d 72, 83 (1st Cir. 2000) (holding that the absence of discussion about using a gun before a second robbery fairly invited the conclusion that

- 13 -

it would proceed "in essentially the same manner [as the first], including the intimidation of . . . employees with a gun"); see also United States v. Spinney, 65 F.3d 231, 237 (1st Cir. 1995) (holding that "a defendant's substantial involvement over the course of several days in planning and orchestrating a robbery, when coupled with actual participation in carrying it out, permits a compelling inference that the defendant knew the salient details of the plot . . . . [including] that [an accomplice] likely would tote a gun"). And that also supports the conclusion that Tang at the very least anticipated his co-defendants would "otherwise use" their firearms -- short of discharge, but beyond mere brandishing -- during the Brookline robbery, which they did by pointing their guns at the victim's head to intimidate her into compliance.[6] See United States v. Warren, 279 F.3d 561, 563 (7th Cir. 2002) (affirming "otherwise used" firearm enhancement where the defendant pointed a gun at a bank teller to "intimidate[]" her); see also United States v. Lasseque, 806 F.3d 618, 624 (1st Cir. 2015) (holding in bank-robbery case that guns are "tools of the trade" for certain offenses and that "awareness of the general plan is sufficient to infer knowledge that weapons would be used to carry that plan through to completion").

---

[6] Tang does not dispute on appeal that pointing a firearm at a victim's head constitutes "otherwise us[ing]" it.

Other evidence beyond Nunez's testimony supports the district court's finding. For example, Zhang, the Brookline victim, testified at Barbosa's trial that once Tang unlocked the spa's entrance, "two guys came in with two guns" and "pointed [them] to my head." The district court could have found by a preponderance of the evidence that it was reasonably foreseeable to Tang that his co-defendants would "possess" or "otherwise use" firearms at either robbery. See Balsam, 203 F.3d at 83.

There was no error in the district court's acceptance of Nunez's testimony in support of the enhancements. See United States v. Quiñones-Meléndez, 791 F.3d 201, 204-06 (1st Cir. 2015). "[I]t is the sentencing court's unique 'responsibility to make credibility determinations about witnesses.'" United States v. Carvajal, 85 F.4th 602, 612 (1st Cir. 2023) (quoting United States v. Nagell, 911 F.3d 23, 31 (1st Cir. 2018)), cert. denied, 144 S. Ct. 1042 (2024). Having presided over Barbosa's trial, the sentencing judge was "well-acquainted with . . . [the] crew, its methods, and the crimes committed," and had a "front row seat" from which to assess Nunez's credibility. Fígaro-Benjamín, 100 F.4th at 302; see also Berrios-Miranda, 919 F.3d at 81. Nunez's testimony was subject to cross examination, even if not to Tang's liking. See Berrios-Miranda, 919 F.3d at 81 ("[T]he victim may not have been cross-examined by [the defendant] or to [the defendant's] liking by counsel for the codefendant, but . . . 'that

is not fatal in and of itself[,]' . . . [as] even if the victim had not been cross-examined at trial, it would still be within the district-court judge's discretion [here] to consider the victim's testimony at sentencing." (quoting United States v. Acevedo-López, 873 F.3d 330, 340 (1st Cir. 2017))).  The experienced district court judge was well aware of Tang's credibility challenges and rejected them.

Tang's argument that targeting massage parlors rather than banks made firearm use "unforeseeable" also misses the point. Both bank and massage parlor robberies carry an obvious risk of direct confrontation with employees and customers, making it foreseeable that Tang's co-defendants would bring guns to intimidate victims or overcome resistance.  See United States v. Montes-Fosse, 824 F.3d 168, 171 (1st Cir. 2016) (rejecting the argument that firearm use was unforeseeable where an accomplice approached a postal worker in daylight with a gun and demanded packages, holding that even if the defendant had not seen the gun, it was reasonably foreseeable that the accomplice would use one to ensure the victim complied and to ward off "any resistance from . . . other passerby or authority"); see also Lassend v. United States, 898 F.3d 115, 132 (1st Cir. 2018) (holding that one who commits the offense of first-degree robbery under New York law "'runs the risk' that the accomplice will employ or threaten

violent force to facilitate the robbery" (citation omitted) (quoting Dean v. United States, 556 U.S. 568, 576 (2009))).

Tang's remaining arguments also fail. He asserts that Application Note 3(D) to the relevant conduct guideline does not support a rule that the use of firearms is foreseeable in every robbery -- but the district court did not apply a categorical rule; it based its findings on the evidence described above. Tang also emphasizes that no witness testified, or image showed, that he ever saw Nunez or Barbosa holding or using a gun. Even if the record did not support Tang's actual knowledge, his argument misapprehends the law. The inquiry is one of reasonable foreseeability, not actual knowledge. See Montes-Fosse, 824 F.3d at 171; see also United States v. Carter, 560 F.3d 1107, 1113 (9th Cir. 2009) (holding that while the defendant was late to the meeting at which the robbery was planned and so may not have had actual knowledge that guns would be used, "[i]t [wa]s reasonable to infer from the nature of the plan . . . that guns would be used" (quoting United States v. Allen, 425 F.3d 1231, 1234 (9th Cir. 2005))). Nor did the district court err in not accepting Tang's statement at the plea hearing that he had no personal knowledge that a firearm was pulled out or used at either robbery.[7] See

_____

[7] Tang's related argument that the district court "was obligated to address th[e] material conflict between . . . Tang and Nunez and to explain why . . . it chose to credit testimony

- 17 -

United States v. Adams, 971 F.3d 22, 40 (1st Cir. 2020) (holding that a district court need not credit a "self-serving, unsupported claim of innocence" (quoting United States v. Ramos, 810 F.2d 308, 313 (1st Cir. 1987))).

**D.**

Tang's separate argument also fails that the district court clearly erred in finding that a preponderance of the evidence

---

from the dubious Nunez at the Barbosa trial" was not raised below and so receives plain error review. To prevail on plain error review, the defendant must show "(1) that an error occurred (2) which was clear or obvious and which not only (3) affected the [defendant's] substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings." United States v. Rivera-Rivera, 146 F.4th 59, 85 (1st Cir. 2025) (quoting United States v. Montero-Montero, 817 F.3d 35, 37 (1st Cir. 2016)). Because Tang's "brief fails to even mention plain error, let alone argue for its application," he has waived this argument. United States v. Martínez-Mercado, 132 F.4th 61, 68-69 (1st Cir. 2025) (quoting United States v. Cruz-Ramos, 987 F.3d 27, 40 (1st Cir. 2021)). In any event, the argument, even if preserved, is also wrong as a matter of law. See United States v. Sayer, 916 F.3d 32, 38 (1st Cir. 2019) ("Sentencing courts need not recount every detail of their decisional processes; identification of the 'main factors behind [the] decision' is enough." (alteration in original) (quoting United States v. Vargas-García, 794 F.3d 162, 166 (1st Cir. 2015))). Tang's reply brief asserts that the argument is not merely procedural but sounds in due process. Even if we assume dubitante that argument is preserved, it plainly fails: the district court permissibly relied on testimony that it reasonably found to be credible. See United States v. Rodriguez, 115 F.4th 24, 49 (1st Cir. 2024) ("[A] court may base sentencing determinations on any evidence that it reasonably finds to be reliable." (quoting United States v. Walker, 665 F.3d 212, 232 (1st Cir. 2011))).

showed that each co-defendant carried and used a "firearm" as that term is defined in the Guidelines.

The Guidelines' definition of "firearm" closely tracks the one applicable to 18 U.S.C. § 924(c),[8] which requires proof that a defendant used a real firearm when committing the predicate offense. See United States v. Cruz-Rivera, 904 F.3d 63, 68 (1st Cir. 2018). The government's proof "need not reach a level of scientific certainty." Id. (internal quotation marks omitted) (quoting United States v. Cruz-Díaz, 550 F.3d 169, 173 (1st Cir. 2008)). "Descriptive lay testimony can be sufficient to prove that the defendant used a real gun," and "a witness need not be familiar with firearms, nor have held the weapon to testify that it was real." Id. (first quoting Cruz-Díaz, 550 F.3d at 173; and then quoting United States v. Martinez-Armestica, 846 F.3d 436, 441 (1st Cir. 2017)).[9]

The record amply supports the district court's finding. Nunez testified at Barbosa's trial that he brought a small black

[8] In 1991, the Sentencing Commission revised the Guidelines' definition of "firearm" "to track more closely the definition of firearm in 18 U.S.C. § 921." U.S.S.G. App. C, amend. 388.

[9] Tang's argument that the unloaded gun should be treated as a "dangerous weapon" rather than a "firearm" also fails under the plain language of U.S.S.G. § 1B1.1, which states that a "firearm" includes any weapon "which will or is designed to or may readily be converted to expel a projectile by the action of an explosive," "the frame or receiver of any such weapon," "any firearm muffler or silencer," or "any destructive device." Id. § 1B1.1(H).

semiautomatic handgun to the robberies. At Barbosa's trial, the police testified that they found a loaded magazine in his glove compartment and a Smith & Wesson safety manual in his apartment. Nunez testified that Barbosa carried a "[h]andgun, semiauto, black." The victims' descriptions of the guns and their reactions to them corroborated that testimony. See Martinez-Armestica, 846 F.3d at 440 (holding that victims' reactions to threats with apparent firearms can themselves support a finding that the guns were real).

Tang's argument that the government could not have met its burden because his co-defendants' guns were never recovered or tested is wrong. Credible testimony suffices to establish that the firearms were real. See id.; see also United States v. De León-Quiñones, 588 F.3d 748, 752 (1st Cir. 2009) (holding that witnesses' references to a "pistol," "revolver," and "firearm" were "most naturally understood to refer to real firearms"). It is axiomatic that sentencing courts may "rely on '[e]ither direct or circumstantial evidence,' and [are] 'free to draw commonsense inferences' therefrom." United States v. Burgos, 133 F.4th 183, 190 (1st Cir. 2025) (first alteration in original) (quoting United States v. Rogers, 17 F.4th 229, 234 (1st Cir. 2021)).

Tang's sentence is **affirmed**.