# United States Court of Appeals
## For the First Circuit

No. 21-1749

UNITED STATES OF AMERICA,

Appellee,

v.

MAXIMILIANO FÍGARO-BENJAMÍN,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Francisco A. Besosa, U.S. District Judge]

Before

Kayatta, Lipez, and Thompson,
Circuit Judges.

Edgar L. Sánchez-Mercado for appellant.

Julia M. Meconiates, Assistant United States Attorney, with
whom W. Stephen Muldrow, United States Attorney, and Mariana E.
Bauzá-Almonte, Assistant United States Attorney, Chief, Appellate
Division, were on brief, for appellee.

April 30, 2024

**THOMPSON, Circuit Judge.** Before this court is another installment in the multi-defendant drug conspiracy case involving the Black Wolfpack, a vessel that transported cocaine smugglers and their product between Puerto Rico and St. Thomas until federal agents intercepted the boat and its trafficking crew off the coast of St. Thomas in January 2018. Since then, the indictees (charged with conspiracy to possess with intent to distribute controlled substances in violation of 21 U.S.C. §§ 841 and 846 and conspiracy to import controlled substances into the U.S. in violation of 21 U.S.C. §§ 952, 960, and 963) have brought assorted challenges to sundry aspects of the criminal proceedings that followed.

Today, the Black Wolfpack sails again, this time in an appeal brought by Maximiliano Fígaro-Benjamín (Fígaro-Benjamín), a coconspirator and one-time captain of the boat, who raises a series of challenges to the 292-month sentence the district court imposed in the wake of Fígaro-Benjamín's straight guilty plea. Fígaro-Benjamín filed this timely appeal, in which he takes issue with what evidence the court relied upon at sentencing and with how it calculated and explained the sentence it meted out. In fielding the appeal, we write primarily for the parties, who well know the facts, travel, and issues presented to us. Accordingly, we endeavor to be efficient with the background information we do

include here,[1] directing readers to our earlier cases chronicling the conspiracy narrative in considerable detail so we can move directly to our analysis of the various appellate issues Fígaro-Benjamín presents.[2]

As our examination will reveal, we must affirm.

## I.

Having studied Fígaro-Benjamín's papers carefully, we think his arguments can be best distilled as follows: (a) the sentencing court committed error when it considered testimony elicited at the trial of Fígaro-Benjamín's coconspirators; (b) the court improperly calculated his guidelines sentencing range (GSR)

---

[1] Since Fígaro-Benjamín appeals from a guilty plea, the facts we mention are drawn from "his plea agreement, the undisputed sections of the presentence investigation report ('PSR'), and the transcripts of his change-of-plea and sentencing hearings." United States v. González, 857 F.3d 46, 52 (1st Cir. 2017) (citing United States v. Rivera-González, 776 F.3d 45, 47 (1st Cir. 2015)).

[2] Our earlier opinions about the conspiracy and its various participants -- like Bernardo Coplin-Benjamín (Coplin), Katerin Martínez-Alberto (Martínez), and Alexandria Andino-Rodríguez (Andino) -- paint a comprehensive picture of the trafficking enterprise. See United States v. Coplin-Benjamín, 79 F.4th 36 (1st Cir. 2023) (affirming Coplin's sentence after dispatching his sentencing arguments challenging an enhancement for being an organizer or leader of the conspiracy, the consideration of his cooperation, and the substantive unreasonableness of his sentence); United States v. Andino-Rodríguez, 79 F.4th 7 (1st Cir. 2023) (affirming as to codefendants Martínez and Andino -- who exercised their trial rights and were convicted for their roles in the conspiracy after an eight-day trial -- by rejecting the trial-error challenges raised by Martínez and rejecting the sentencing challenge advanced by Andino), cert. denied sub nom. Martínez-Alberto v. United States, 144 S. Ct. 518 (2023) (mem.).

- 3 -

because the court relied on an unsupported-by-the-record drug quantity and, in addition, erroneously found Fígaro-Benjamín was a supervisor in the trafficking operation; and (c) the court committed procedural error when it inadequately explained its pronounced sentence. We take these in turn.

### (a) Reliance on Trial Testimony at Sentencing

Fígaro-Benjamín submits the sentencing court erred and infringed on his Sixth Amendment rights when, without notice, it considered what he says is unreliable testimony offered by José Javier Resto Miranda (Resto),[3] not at Fígaro-Benjamín's sentencing hearing, but at the trial of his codefendants, Martínez and Andino.[4]

---

[3] A fellow Black Wolfpack coconspirator, Resto was recruited by Coplin to participate in the venture. Because of the degree of his involvement (a purchaser of the vessel, planner of trips, recruiter of various participants (including Fígaro-Benjamín), crew member, and general drug runner, to name a few ways he participated), he was eminently familiar with the inner workings of the conspiracy, the roles played by his cohorts, and the amount of product they transported. When Resto testified at his codefendants' trial, he did so pursuant to a cooperation agreement. See Andino-Rodríguez, 79 F.4th at 15 n.8.

[4] To be clear, the next section of analysis will tackle Fígaro-Benjamín's complaints that the sentencing court erred in relying on Resto's testimony to find, for purposes of sentencing, that Fígaro-Benjamín was responsible for possessing and importing a grand total of at least 267 kilos of cocaine over the course of the conspiracy. This section solely takes aim at Fígaro-Benjamín's argument that the district court should not have considered Resto's testimony at all.

For its part, the government disagrees and says the district court offended no constitutional right afforded to Fígaro-Benjamín when it considered Resto's testimony.

And this is our take, offered (favorably to Fígaro-Benjamín) under the most appellant-friendly lens of review this type of claim could garner. See, e.g., United States v. Sandoval, 6 F.4th 63, 86 (1st Cir. 2021) (assuming a confrontation-based argument was preserved "because, even on the understanding that our review is de novo, [that] challenge still fails").

It is axiomatic that, as here, when fashioning a sentence, a court must take into account the 18 U.S.C. § 3553(a) factors (like the nature and circumstances of the offense, the defendant's history and characteristics, the need for the sentence to reflect the seriousness of the offense and promote respect for the law, to provide deterrence, to protect the public, to provide the defendant with needed training and care, and so on). When a sentencing court does this, in general there is "[n]o limitation . . . placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider." 18 U.S.C. § 3661.

Just as axiomatic is the principle that defendants do not ordinarily enjoy a Sixth Amendment right to confrontation at sentencing. United States v. Rondón-García, 886 F.3d 14, 21 (1st

Cir. 2018) (providing that, at "a sentencing hearing, neither the Federal Rules of Evidence nor the Sixth Amendment's confrontation clause applies"); see also United States v. Berrios-Miranda, 919 F.3d 76, 81 (1st Cir. 2019); United States v. Bramley, 847 F.3d 1, 5 (1st Cir. 2017).  As a result, "sentencing judges may consider any evidence with 'sufficient indicia of reliability to support its probable accuracy.'"  Berrios-Miranda, 919 F.3d at 80 (quoting United States v. Cintrón-Echautegui, 604 F.3d 1, 6 (1st Cir. 2010)).  "Under this approach, the court has considerable leeway to rely upon 'virtually any dependable information.'"  Id. (quoting United States v. Doe, 741 F.3d 217, 236 (1st Cir. 2013)); see also Cintrón-Echautegui, 604 F.3d at 6 ("These tenets are fully applicable to drug quantity determinations.").

But the court's discretion to do so "is not boundless and must comply with due process considerations and the parameters of Federal Rule of Criminal Procedure 32."[5]  Rondón-García, 886 F.3d at 21 (citing Bramley, 847 F.3d at 5); see also Betterman v. Montana, 578 U.S. 437, 448 (2016) ("After conviction, a defendant's due process right . . . is still present.  He retains an interest in a sentencing proceeding that is fundamentally fair.").  And

_____

[5] Rule 32 provides, in relevant part, that the court must provide defendants "any information excluded from the presentence report . . . on which the court will rely in sentencing, and give them a reasonable opportunity to comment on that information." Fed. R. Crim. P. 32(i)(1)(B).

"[d]ue process requires that the defendant be sentenced on information that is not false or materially inaccurate." Rondón-García, 886 F.3d at 21 (citing United States v. Curran, 926 F.2d 59, 61 (1st Cir. 1991)). In addition, "[t]he defendant must be given adequate notice of those facts [the court will consider] prior to sentencing and the court must 'timely advise the defendant . . . that it heard or read, and was taking into account [those facts].'" Id. (quoting United States v. Acevedo-López, 873 F.3d 330, 341 (1st Cir. 2017)) (cleaned up). "'[A] defendant must be provided with a meaningful opportunity to comment on the factual information on which his or her sentence is based,' unless that information 'fall[s] within the garden variety considerations which should not generally come as a surprise to trial lawyers who have prepared for sentencing.'" Id. (alterations in original) (first quoting United States v. Berzon, 941 F.2d 8, 21 (1st Cir. 1991), then quoting United States v. Pantojas-Cruz, 800 F.3d 54, 61 (1st Cir. 2015)).

Here, the district court, in fashioning a sentence, considered evidence from the trial of Fígaro-Benjamín's codefendants, accepting as reliable Resto's testimony regarding the amount of cocaine being ferried between Caribbean islands and Fígaro-Benjamín's role in that scheme. Our inquiry is whether, in doing so, the court ran afoul of any of the just-recounted legal

foundational principles as Fígaro-Benjamín suggests it did.  We conclude it did not, and here's why.

The first of our conclusions here rests upon our application of straightforward, well-settled case law:  As earlier noted and as the government correctly points out, defendants do not enjoy a Sixth Amendment right to confrontation at sentencing, meaning the fact that Resto did not personally testify at Fígaro-Benjamín's sentencing hearing, in and of itself, is not determinative.  See, e.g., id.  Fígaro-Benjamín's opening brief cites no law to suggest otherwise, and indeed he acknowledges this controlling precedent in his reply papers.

We do agree with Fígaro-Benjamín's contention that information provided by Resto and considered by the court needed to have the necessary indicia of reliability and trustworthiness, but after our review of the record, we reject his assertion that the information here was wanting.  For one thing, Fígaro-Benjamín's sentencer had presided over the codefendants' trial, and because of that, he was well-acquainted with the Black Wolfpack, its crew, its methods, and the crimes committed.  Additionally, the judge's front row seat at trial allowed him to witness and assess Resto's credibility and testimony.  See Berrios-Miranda, 919 F.3d at 81 ("Plus, the resentencing judge presided over Berrios's codefendant's trial, so she was already familiar with the issues and had been there to observe the victim's testimony and assess

- 8 -

credibility firsthand."). And, critically, Resto's testimony was offered under oath, corroborated by other evidence,[6] see, e.g., id. (reasoning that the court's reliance on trial testimony was within its discretion when the testimony was given under oath and corroborated by other evidence), and put through the cross-examination gauntlet by defense attorneys at trial, cf. id. at 80-81 (reasoning that "even . . . 'statements which have not been subjected to the crucible of cross-examination'" can be relied upon in the court's considerable discretion (quoting Acevedo-López, 873 F.3d at 340)).

Our final resolution of this aspect of Fígaro-Benjamín's sentencing challenge centers on whether we conclude he received adequate notice that Resto's prior testimony would be used at his sentencing hearing. He says he did not. Yet in his briefing, Fígaro-Benjamín fails to elucidate why he believes that to be so.

---

[6] The sentencing judge, as mentioned, presided over the trial at which the government presented Resto as a cooperating, coconspirator witness, and at which Resto's testimony was corroborated by other evidence, thus underscoring its reliability for our purposes today. As one example, consider Resto's prior testimony about how he and the crew cleaned the drug kilos, vacuum sealed them, greased them, and then sealed them up again -- some of these bundles had stickers or logos affixed to them, he said. He explained that he and Fígaro-Benjamín, our appellant, hid the kilos under a table near some water pumps. That testimony was corroborated by the government's witnesses describing where the bundles had been stashed on the Black Wolfpack (under a table, near a bathroom) and by trial exhibits showing the seized kilos, which were packaged in a manner consistent with Resto's description (including stickers and logos).

And after our perusal of the record, we find he got what notice due process demands, as we explain.

In September 2019, two years before his sentence was imposed, Fígaro-Benjamín himself requested (and got a same-day order granting him) access to his codefendants' trial transcripts (to remind, Martínez and Andino were the only coconspirators who chose to proceed to a trial). In that request, he described the testimony generated in that proceeding as "implicat[ing] Mr. Fígaro-Benjamín" and as "pertinent and especially relevant to his sentencing." That description makes sense -- when it comes to a trafficking conspiracy, it is hardly a hot take that testimony elicited at the trial of a coconspirator would be relevant at the sentencing proceeding of another conspiracy member. Because he had access to that transcript, Fígaro-Benjamín would have been pellucidly aware of Resto's accusations well in advance. A sentencing court is permitted to "rely on testimony from a codefendant's trial where" -- as here -- "the information elicited at trial concerning drug quantity and the duration of the conspiracy was 'hardly new to [the defendant] and his counsel'" and it could not have "taken [him] by surprise at his sentencing." United States v. Kenney, 756 F.3d 36, 50 (1st Cir. 2014) (quoting United States v. Rivera-Rodríguez, 489 F.3d 48, 55 (1st Cir. 2007)). Additionally, Fígaro-Benjamín received probation's timely filed PSR, which specifically cited to portions of Resto's trial

testimony. Consequently, ahead of his sentencing, he knew that probation had flagged Resto's testimony in support of its reasoning and recommendations about the quantity of drugs for which Fígaro-Benjamín could be held responsible. See, e.g., Rivera-Rodríguez, 489 F.3d at 55 (reasoning that information could not be considered "new" or absent from the record when it had been set forth in, among other documents, the PSR). All told, Fígaro-Benjamín incontrovertibly knew about Resto's prior testimony and the role it could play at his sentencing in advance, and just as importantly, he had meaningful opportunities to comment on that testimony (in his sentencing memorandum, through objections to the PSR, and in his arguments at the sentencing hearing). See Berrios-Miranda, 919 F.3d at 81 ("And Berrios had advance access to the PSR and transcripts of trial testimony (none of which were 'new' or unknown to him by that point), as well as his 'meaningful opportunity to comment on the factual information on which his . . . sentence is based' at the resentencing hearing, and that's all the due process required here." (quoting Bramley, 847 F.3d at 6)); Cintrón-Echautegui, 604 F.3d at 6 ("Here, the challenged evidence came from witnesses who testified at the trial, and the [PSR] gave ample notice to the appellant of both the existence and the potential utility of this evidence. Under these circumstances, the district court did not err in using this evidence at

sentencing."). Overall, we conclude all of due process' demands were met here.

### (b) Guidelines Range Calculation:
### Drug Quantity and Supervisor Enhancement

Next up is Fígaro-Benjamín's contention that the court procedurally erred when it incorrectly calculated his GSR. Specifically, he argues (1) there was insufficient evidence that he was responsible for trafficking 267 kilos of cocaine, and (2) the court erred when it found he played a supervisory role in the trafficking scheme, prompting the court to tack on (erroneously) a supervisor sentencing enhancement. Accordingly, he says, the resulting range of 292-365 months' imprisonment was imbued with error.

The government flatly takes issue with all of this, urging no procedural error lies here with the court's calculations.

We turn to these arguments mindful that, "when assessing procedural reasonableness, this [c]ourt engages in a multifaceted abuse-of-discretion standard whereby 'we afford de novo review to the sentencing court's interpretation and application of the sentencing guidelines, [examine] the court's factfinding for clear error, and evaluate its judgment calls for abuse of discretion.'" United States v. Maldonado-Peña, 4 F.4th 1, 55-56 (1st Cir. 2021) (alterations in original) (quoting United States v. Arsenault, 833 F.3d 24, 28 (1st Cir. 2016)). "[W]e will find an abuse of

- 12 -

discretion only when left with a definite conviction that 'no reasonable person could agree with the judge's decision.'" Id. at 56 (quoting United States v. McCullock, 991 F.3d 313, 317 (1st Cir. 2021)).

(1)

"Sentences in drug cases are largely driven by the amount and type of drugs involved." Cintrón-Echautegui, 604 F.3d at 5. And "[w]hen sentencing a participant in a drug-trafficking conspiracy, the district court must make an individualized finding concerning the quantity of drugs attributable to, or reasonably foreseeable by, the offender." Id. Sentencing courts are tasked with making these reasonable estimates of drug quantities based on a preponderance of evidence, and, for our part, those fact-based drug quantity determinations get clear error review. See, e.g., Maldonado-Peña, 4 F.4th at 57; see also Cintrón-Echautegui, 604 F.3d at 6 (reminding that "[t]he evidentiary requirements that obtain at sentencing are considerably less rigorous than those that obtain in criminal trials"). And "[c]lear-error review is demanding: this standard will be satisfied only if, upon whole-record-review, an inquiring court forms a strong, unyielding belief that a mistake has been made." United States v. Colón-Cordero, 91 F.4th 41, 57 (1st Cir. 2024) (quoting United States v. Rivera-Nazario, 68 F.4th 653, 658 (1st Cir. 2023)). "As long as the district court's decision is based on reasonable inferences

- 13 -

drawn from adequately supported facts, we will not find clear error." Id. (quoting Rivera-Nazario, 68 F.4th at 658).

Getting down to the nitty-gritty, this is how the district court, which adopted the PSR's recommendation, arrived at its drug quantity finding that Fígaro-Benjamín participated in trafficking at least 267 kilograms of cocaine. First, the 132 kilos seized on the day of the arrest is not in dispute. And then there's the PSR's description of the trial evidence as to three pre-arrest trips (per Resto's testimony about Fígaro-Benjamín's personal involvement) that cover the 135-kilo balance needed to reach 267:

- The first trip (June 2017), aboard another vessel, was undertaken in an attempt to traffic 10 kilos;
- The second trip (summer 2017), now on the Black Wolfpack, resulted in the successful importation of at least 65 kilos (Resto explained the original plan was to traffic 45-60 kilos, but Fígaro-Benjamín snagged another 20 or 25);
- The third trip (fall 2017), also on the Black Wolfpack, led to 60 kilograms being imported into Puerto Rico.

Assuming the reliability of the information, the math checks out (132 + 10 + 65 + 60 = 267).

But to Fígaro-Benjamín's thinking, it does not. Fígaro-Benjamín's overall beef with the drug calculus continues the theme that the sentencing court wrongly based its finding on Resto's testimony, and that, in turn, led to the 267-kilos determination and the ramping up of the base offense level, which tainted the

- 14 -

GSR calculation, thus poisoning his resulting sentence. But these arguments do not persuade.

Fígaro-Benjamín asserts that the "real evidence," as he puts it, demonstrated he should be held responsible only for those 132 kilos actually seized on the day the Black Wolfpack was interdicted and its crew arrested. By focusing on "physical or real evidence" -- all the government would have been able to prove at trial, Fígaro-Benjamín says -- he seems to be suggesting the sentencing court could not take Resto's drug quantity testimony into account because, in his telling, there is no physical evidence to support Resto's assertions about the quantity of drug product the conspiracy moved (he seems to operate from a belief that production of physical drug evidence would be the only way to corroborate a coconspirator's testimonial evidence). But he does not point to -- nor are we aware of -- any case law that supports this contention.[7] Quite the opposite, our case law tells us that

---

[7] Fígaro-Benjamín points to United States v. Taveras, 118 F. App'x 516, 518 (1st Cir. 2004), but it does not help him. There, a panel of this court affirmed a sentencing court's drug quantity determination when the court had -- cautiously and in its discretion -- "credit[ed] some portions of a witness's testimony, but not others," "limit[ing] its reliance upon [the] testimony" to ascertain the necessary preponderance of quantity-related evidence without reliance on what had been deemed "weaker or otherwise uncorroborated testimony." Id. But just because a court in one case had reason to discredit and limit its reliance on some portion of testimony does not undercut what occurred here. Drug quantity assessments are case- and fact-dependent. Fígaro-Benjamín's reliance on Taveras assumes the unreliability of Resto's testimony, but unlike the situation in Taveras, the sentencing

testimony about the conspiratorial operations of the plotters is evidence and drug quantity determinations at sentencing aren't limited, as Fígaro-Benjamín contends, to the amount of drugs physically seized. See, e.g., Maldonado-Peña, 4 F.4th at 58 (finding supportable a sentencing court's drug quantity determination when it was based on witness testimony).

And here, for the reasons we've already delineated, Resto's testimony about the quantity of drugs being smuggled was reliable, and accordingly, the district court's acceptance of that testimony was not clearly erroneous. See Berrios-Miranda, 919 F.3d at 80 (explaining that "the court has considerable leeway to rely upon 'virtually any dependable information'" (quoting Doe, 741 F.3d at 236)); see also Cintrón-Echautegui, 604 F.3d at 6 ("These tenets" -- that a sentencer can rely on nearly anything, including testimony (even non-cross-examined testimony) and information in the PSR -- "are fully applicable to drug quantity determinations.").

Before we move on, we pause to address a couple other purported flaws Fígaro-Benjamín raises about the court's drug calculus, none of which move the needle. Fígaro-Benjamín, pointing to the trial of coconspirators Martínez and Andino, observes that

_____

court here did not voice any concern about the reliability of Resto's testimony. And, as we've explained, it was indeed supportably reliable for purposes of sentencing.

- 16 -

the jury there found them responsible for only five or more kilos, meaning (he says) the jury didn't believe Resto's drug quantity testimony in concluding the conspiracy only "was for more than five kilograms . . . , nothing more and nothing less."  But the jury's drug quantity finding at the trial of his codefendants (even if we take Fígaro-Benjamín's characterization of it at face value) does not control sentencing-phase drug quantity determinations for Fígaro-Benjamín, who opted not to go to trial.  Rather, as the government rightly notes, following Fígaro-Benjamín's guilty plea, the sentence within the statutorily-prescribed range of ten years' to life imprisonment was properly established here not through a jury finding, but through the district court's consideration of sufficient, reliable evidence to support its drug quantity determination.[8]  See United States v. Soto-Villar, 40 F.4th 27, 33 (1st Cir. 2022) (noting that, at sentencing, when "a drug quantity finding is used to develop a defendant's guideline range, the government has the burden of proving the drug quantity by a preponderance of the evidence").

---

[8] As the PSR noted, according to the 2018 Guideline Manual probation used to craft the recommended sentence, "[t]he guideline for a violation of 21 U.S.C. §§ 841, 846, 952 and 960" -- the charges to which Fígaro-Benjamín pled -- "is found in USSG §2D1.1," and "[b]ecause Mr. Fígaro is accountable for importing and/or possessing with intent to distribute 267 kilograms of cocaine, the base offense level is 36" pursuant to § 2D1.1(c)(2).

Finally, we mention but won't dwell on Fígaro-Benjamín's accusation that, during the change of plea hearing, the government agreed to limit the drug quantity for Fígaro-Benjamín to the actually-seized 132 kilograms. We've looked at the record, and this is not what it reflects. True, the government stated 132 kilos were seized on the day Fígaro-Benjamín and his coconspirators were arrested, but the government also accurately represented that Fígaro-Benjamín participated in other trafficking trips in 2017, importing additional kilos as part of those journeys.

No more need be said other than, to reiterate, we find no clear error in the 267-kilos finding. So we soldier on to Fígaro-Benjamín's remaining claim of procedural error as to the GSR: the sentencing enhancement.

(2)

Fígaro-Benjamín's next attack on the GSR is his assertion that the court erred when it determined Fígaro-Benjamín was a supervisor within the conspiracy and, thus, subject to the applicable sentencing enhancement. See U.S.S.G. § 3B1.1(b) (explaining that a defendant may receive a three-level increase in their guideline calculation if they were "a manager or supervisor . . . and the criminal activity involved five or more participants

or was otherwise extensive").[9]  Before we go further though, first principles will help frame the coming discussion of this argument.

"The government has the burden of proving the propriety of an upward role-in-the-offense adjustment," and "[i]t must meet this burden by a preponderance of the evidence." United States v. McKinney, 5 F.4th 104, 107 (1st Cir. 2021).  "On appeal, we review the district court's underlying factual findings for clear error and legal questions (including the interpretation and application of the sentencing guidelines) de novo." Id.  Critically, "[w]here the raw facts are susceptible to competing inferences, the sentencing court's choice between those inferences cannot be clearly erroneous." Id. (quoting United States v. McCormick, 773 F.3d 357, 359 (1st Cir. 2014)).

As far as the mechanics of applying this supervisor enhancement go, "[t]he plain language of the Guidelines requires that a two-step process be employed . . . : (1) scope -- that criminal activity involved five or more participants or was otherwise extensive, (2) status -- that the defendant was a manager or supervisor (but not an organizer or leader)." Id. at 108.

---

[9] The guidelines set out that when a defendant gets an adjustment for having played an aggravating role in the offense pursuant to § 3B1.1, two additional levels should be added if the offense conduct involved the importation of controlled substances. See U.S.S.G. § 2D1.1(b)(16).  That's what happened here, so in challenging the application of the former, Fígaro-Benjamín also challenges by extension the resulting application of the latter.

Fígaro-Benjamín does not contest any aspect of the first step application, rather his focus (and thus ours) is on step two.

The guidelines don't provide a definition of what it means to be a supervisor as challenged here, but we've explained that "[e]vidence of the defendant's role . . . need only show that he exercised authority or control over another participant on one occasion" in the conspiracy, and that evidence "may be wholly circumstantial."  Id. (quoting United States v. Cortés-Cabán, 691 F.3d 1, 28 (1st Cir. 2012)); see also id. at 108-09 (observing that U.S.S.G. § 3B1.1(c)'s analogous enhancement based on "organizer, leader, manager, or supervisor" will apply when "the defendant, in committing the offense, exercised control over, organized, or was otherwise responsible for superintending the activities of, at least one of those other persons" (quoting United States v. Cruz, 120 F.3d 1, 3 (1st Cir. 1997))).

Now some parameters for what it means to have authority or control over another criminal actor.  "[F]or the enhancement to apply, it is not enough to show that 'the defendant merely controlled, organized, or managed criminal activities; rather, he must instead control, organize, or manage criminal actors.'"  Id. at 109 (quoting Cortés-Cabán, 691 F.3d at 29).  "[A] defendant need not possess a formal, coercive and hierarchal relationship with a subordinate in order to qualify for the enhancement" -- rather, "[t]he key inquiry is whether the defendant 'exercised

- 20 -

control over, managed, organized, or superintended the activities' of 'another criminal actor.'" Id. (quoting United States v. Ilarraza, 963 F.3d 1, 13 (1st Cir. 2020)). Indeed, "[t]he authority possessed by the defendant may be fairly minimal; 'a defendant need not be at the top of a criminal scheme to be a manager or supervisor.'" United States v. García-Sierra, 994 F.3d 17, 37 (1st Cir. 2021) (quoting United States v. Goldberg, 105 F.3d 770, 777 (1st Cir. 1997)). We've explained "[t]his is a relatively low bar, and the fact that control may be exhibited on a single occasion reinforces the notion that a formal chain of command is not necessary for the enhancement to apply." McKinney, 5 F.4th at 109.

In our clear-error review of the "district court's fact-bound determination of a defendant's role in the offense," id. at 108, we are acutely aware that "[t]he determination of an individual's role in committing an offense is necessarily fact-specific," meaning our "review must be conducted with considerable deference," id. (quoting United States v. Soto-Peguero, 978 F.3d 13, 23 (1st Cir. 2020)).

Back to Fígaro-Benjamín, who argues he was no more than a mere employee within the Black Wolfpack criminal enterprise. He says there is no evidence he issued orders, made decisions, or had any control over what his coconspirators did. And indeed he wasn't even trusted to handle cash flow in any way because (as he

stresses) he wasn't the manager; Coplin and Resto were the leaders and Fígaro-Benjamín was only ever following orders.[10]  A conclusion to the contrary, Fígaro-Benjamín says, ignores other relevant evidence from the codefendants' trial.

The government pushes back, submitting that the evidence fully supports the court's findings.  Much like it did below, the government leans on a variety of examples of Fígaro-Benjamín demonstrating the control necessary to satisfy the low bar our precedent sets for the supervisor enhancement.

For our part, we agree with the government, and we home in on two examples to show why.

Traveling back to the Black Wolfpack's summer 2017 journey to St. Thomas, the record reflects that, upon arrival, Fígaro-Benjamín left the Black Wolfpack and the marina where it was docked to meet with the cocaine supplier while Resto and Andino stayed behind.  Fígaro-Benjamín then sent a taxi to the marina to retrieve Resto and Andino to bring them to the apartment where Fígaro-Benjamín was holed up so that Resto and Andino could help him get the kilos ready for transport.  Once there (because Fígaro-Benjamín had sent for them), the three coconspirators did just that, vacuum sealing the bundles of coke.  The idea that Fígaro-

_____

[10] Because we've already explained why Resto's testimony is reliable and was properly considered at sentencing, we set aside the aspects of Fígaro-Benjamín's argument that contend otherwise.

- 22 -

Benjamín was summoning his coconspirators, i.e., exercising control over another actor in the operation, is thus reasonably supported here.

On top of this, Fígaro-Benjamín text messaged with both Martínez and Andino in a way that supported a supervisory-role finding. As the PSR explains[11] and as the government argued at sentencing (showing the sentencing court exhibits from trial in support), when the crew was getting ready for its January 2018 voyage -- one that would be undertaken without Resto and for which Fígaro-Benjamín served as captain -- Fígaro-Benjamín texted Andino that he'd decided the departure date and instructed her about the necessary preparations that she and others needed to undertake so they could sail on that date. And texts from Fígaro-Benjamín to

---

[11] In support of its recommendation that the supervisor enhancement be added to the GSR calculations, the PSR stated:

> Trial testimony revealed Mr. Fígaro would be the one to meet with the contact person in Saint Thomas . . . for collection of the kilograms of cocaine and supervised and participated, along with others, in the preparation and packaging of the cocaine for transport. Additionally, as provided by the Government in evidence, text messages between Mr. Fígaro and Martinez shows Mr. Fígaro's control and authority over her when he disciplines the co-defendant for not answering the phone. The text message between Mr. Fígaro and co-defendant Coplin shows his participation and planning or organizing the offense in their coordination discussions about obtaining the cocaine; as well as . . . text messages with co-defendant Andino where Mr. Fígaro is organizing his smuggling group. All factors considered for role enhancement pursuant to USSG § 3B1.2, Application 4.

Martínez showed Fígaro-Benjamín scolding Martínez when she didn't answer his messages quickly enough.[12]

The government points to other examples, but as our case law says, the government's burden is to put forth a preponderance of evidence as to just one occasion of control over another criminal actor. Even looking only at the above-recounted instances, we conclude the government has done so -- the evidence before the sentencing court (and as recommended by probation in the PSR it prepared for Fígaro-Benjamín's sentencing) reasonably supports the conclusion that Fígaro-Benjamín's role involved at least a minimal degree of control over others, on at least one occasion, such that the sentencing court did not err in its factfinding on this point or, it follows, in deploying the supervisory enhancement as a result of that finding. See, e.g., McKinney, 5 F.4th at 109-10; García-Sierra, 994 F.3d at 37-39; Cortés-Cabán, 691 F.3d at 28-29; see also United States v. Hilario-Hilario, 529 F.3d 65, 77-78 (1st Cir. 2008) (affirming the application of the supervisor enhancement when the defendant was a captain of the boat "who gave instructions to other participants" and "discuss[ed] logistics of the operation with another

---

[12] Not only did Fígaro-Benjamín reprimand Martínez for not answering her phone, but also he stated she "ha[s] to answer the phone quickly every time [he] call[s]," just in case "some side job appears for [her]." In fact, he wrote that two weeks prior, he'd assigned a job to Andino after Martínez didn't answer her phone promptly.

participant").  On balance, in view of our precedent and our demanding lens of review, we spy no clear error in the court's application of the three-level supervisor enhancement.

Still trying to fend off this conclusion, Fígaro-Benjamín points to United States v. Flores-de-Jesús, 569 F.3d 8, 35 (1st Cir. 2009), to support his insistence that "the record is devoid of any evidence to show that [Fígaro-Benjamín] exercised control over any individual . . . [or] oversaw their activities." Id. (quoting United States v. Ofray-Campos, 534 F.3d 1, 40 (1st Cir. 2008)) (second alteration in original).  Our discussion up to this point already explains why this is not so.  And we think Fígaro-Benjamín's reliance on Flores-de-Jesús is misplaced because the outcome there is so readily distinguishable.  In that case, the problem was that the record showed a criminal defendant who "was deeply involved in the operation," but showed absolutely nothing -- no findings by the court, no findings delineated in or link asserted by the PSR, no testimonial evidence that could serve as "a proper basis for the enhancement" -- that supported the supervisor finding and enhancement that was ultimately applied. Id. at 35.  Here, as we've said, between Resto's testimony and the detailed PSR, there was sufficient record support for the court's finding.

In urging us to see things his way -- that Resto and Coplin were the leaders, not him, and he was merely an orders-

obeying employee of the operation -- Fígaro-Benjamín essentially is beseeching us to "take a different view of the same facts that were before the district court to reach [his] preferred outcome," but this plaint will not carry the day. United States v. Andino-Rodríguez, 79 F.4th 7, 34 (1st Cir. 2023) (providing and relying on examples of our rejecting arguments by defendants that are made on the same facts that were considered by the district court). Our inquiry is not whether his view of the record would support his preferred outcome, or even whether we would reach a different outcome ourselves. Rather, our inquiry is whether the sentencing court's conclusion is supported by the record. "Where the raw facts are susceptible to competing inferences, the sentencing court's choice between those inferences cannot be clearly erroneous." McKinney, 5 F.4th at 107 (quoting McCormick, 773 F.3d at 359). That is the case here, and so we see no error.[13]

---

[13] In a slight offshoot of this argument, Fígaro-Benjamín suggests that because Resto and Coplin were the actual leaders, that means Fígaro-Benjamín, an employee simply following orders, couldn't have been a supervisor. This is not so because (emphasis ours) "[t]he authority possessed by the defendant may be fairly minimal; 'a defendant need not be at the top of a criminal scheme to be a manager or supervisor.'" García-Sierra, 994 F.3d at 37 (quoting Goldberg, 105 F.3d at 777).

As we've explained, "all parties engaged in a criminal enterprise can be 'located on a continuum.'" Andino-Rodríguez, 79 F.4th at 34 (quoting United States v. Arias-Mercedes, 901 F.3d 1, 8 (1st Cir. 2018)). "Those who are primarily responsible stand on one end," and "the least culpable participants . . . stand at the opposite end." Id. Contrary to Fígaro-Benjamín's suggestion, it is supportable and not clearly erroneous that, on this graph, Fígaro-Benjamín stands somewhere in the middle. As a supervisor,

Like the drug quantity attack on the GSR that came before this one, we see no clear error in the factfinding that supported the application of the supervisory enhancement and thus no procedural reasonableness error. We therefore will not disturb the sentencing court's GSR calculation on this basis either.

### (c) Adequacy of Sentencing Explanation

Having confirmed the GSR was validly calculated, we confront Fígaro-Benjamín's final appellate argument: The sentencing court failed to adequately explain its sentence. Debuting this argument on appeal, and without any acknowledgment of the daunting plain-error standard his argument thus faces or any citation to supporting authority, he suggests in his opening brief that the court's sentencing explanation was faulty in that it "[m]erely mention[ed] that it 'considered' the PSR and the sentencing factors," and only ticked the "drug quantity and roles" box on the Statement of Reasons form, rendering the sentence procedurally unreasonable. He also supposes the explanation was inadequate with respect to the 267-kilos finding -- "the sentencing Court did not explain why or how it found Fígaro-Benjamín responsible for 267 kilograms of cocaine."

---

he lies somewhere between Andino, a lesser-participant codefendant, who was denied a mitigating role adjustment, see Andino-Rodríguez, 79 F.4th at 34-36, and Coplin, a leader-participant, who got a four-level enhancement for his aggravating role in the enterprise, Coplin-Benjamín, 79 F.4th at 42.

- 27 -

As the government rightly notes, bound up in this argument are problems of various waiver varieties. See United States v. Pabon, 819 F.3d 26, 33 (1st Cir. 2016) (stating our cautionary that when arguments were not raised below, they will be reviewed for plain error -- but when an appellant does not address that daunting test, we will deem those arguments waived); Rodríguez v. Mun. of San Juan, 659 F.3d 168, 176 (1st Cir. 2011) (deeming arguments waived when a party "provide[d] neither the necessary caselaw nor reasoned analysis" to make the requisite showings); United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) (capturing our oft-stated warning that "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived"). Each of the problems summed up in our parentheticals are on display in this argument.

But in response to the government's points about these procedural shortcomings, Fígaro-Benjamín's reply brief tries to course-correct and attempts the plain-error work, so, generously to him, we will proceed to our plain-error review.[14] This approach

---

[14] In discussing the plain-error standard, the reply also resists its applicability, urging us to deploy the abuse-of-discretion lens we'd use to scrutinize preserved challenges because counsel made certain arguments in Fígaro-Benjamín's sentencing memo and at the hearing. But our case law plainly instructs that, "[w]hen a defendant fails to contemporaneously object to the procedural reasonableness of a court's sentencing determination, we review for plain error." United States v. Sayer, 916 F.3d 32, 37 (1st Cir. 2019); see also United States v. Pupo, 995 F.3d 23, 29 n.5 (1st Cir. 2021) (explaining that "a claim of

is particularly appropriate where, as here, "a defendant's claim would fail even if reviewed for plain error." United States v. Facteau, 89 F.4th 1, 44 n.29 (1st Cir. 2023) (quoting United States v. Grullon, 996 F.3d 21, 32 (1st Cir. 2021)) (cleaned up).

To satisfy our demanding plain-error standard, Fígaro-Benjamín must demonstrate "(1) that an error occurred (2) which was clear and obvious and which not only (3) affected his . . . substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings" -- and that is one "steep climb." United States v. Morales-Cortijo, 65 F.4th 30, 33-34 (1st Cir. 2023) (quoting United States v. Alejandro-Rosado, 878 F.3d 435, 439 (1st Cir. 2017)).

Fígaro-Benjamín says the court committed procedural error in failing to adequately explain the sentence it imposed. He suggests the court's explanation "fall[s] short of the required threshold" in that the facts recited (like 267 kilos imported) weren't enough to explain the hefty sentence that followed,[15] and

---

error for appeal" is "successfully preserve[d]" when an objection is made that puts the sentencing court on notice of "the claimed error" in sentencing).

The record is clear:  There was no objection interposed after the sentencing pronouncement.  Our review is for plain error.

[15] "Especially," he elaborates, "considering that the sentence resulted in a 124 months upward variance, given that the USSG were improperly and incorrectly calculated."  But as we've already explained, the district court did not err in its GSR tabulations, meaning the sentence doled out is a low-end guideline sentence, not the upward variance Fígaro-Benjamín says it is.  The only

the district court didn't articulate any reasons Fígaro-Benjamín's situation was different than ordinary situations contemplated by the guidelines. He then says plain error lies as follows: (1) the sentencing court erroneously calculated the GSR; (2) such error is clear and obvious; (3) Fígaro-Benjamín's substantial rights were affected because "[d]ue process and fundamental fairness were not safeguarded as the Court relied on unreliable testimony and did not give adequate notice about [that] information"; and (4) this infringement on his constitutional rights impairs the fairness, integrity, and reputation of the judiciary.

Plainly, these inadequate-explanation contentions harness some arguments we've already rejected. In any event, as we'll tease out, a quick primer on relevant case law lays the groundwork for why his argument fails no matter how you slice it.

"Federal law requires a sentencer to 'state in open court the reasons for its imposition of the particular sentence.'" Colón-Cordero, 91 F.4th at 50 (quoting 18 U.S.C. § 3553(c)). "The fact that a sentence is consistent with the guideline sentencing range (properly calculated) correlates to some extent with the 'requisite degree of explanation: a within-the-range sentence usually demands a less detailed explanation than a variant sentence.'" United States v. Ruiz-Huertas, 792 F.3d 223, 227 (1st

question at this point is whether the low-end sentence was adequately explained.

- 30 -

Cir. 2015) (quoting United States v. Ocasio-Cancel, 727 F.3d 85, 91 (1st Cir. 2013)). "A sentencing court 'need not be precise to the point of pedantry' in its explanation," United States v. Ubiles-Rosario, 867 F.3d 277, 292 (1st Cir. 2017) (quoting United States v. González, 857 F.3d 46, 62-63 (1st Cir. 2017)), but rather "the court's explication of its sentencing calculus need only 'identify the main factors driving its determination,'" United States v. Daoust, 888 F.3d 571, 576 (1st Cir. 2018) (quoting United States v. Sepúlveda-Hernández, 817 F.3d 30, 33 (1st Cir. 2016)). Indeed, "[w]here, as here, 'the record permits a reviewing court to identify both a discrete aspect of an offender's conduct and a connection between that behavior and the aims of sentencing, the sentence is sufficiently explained to pass muster under section 3553(c).'" Ubiles-Rosario, 867 F.3d at 293 (quoting United States v. Vargas-García, 794 F.3d 162, 166 (1st Cir. 2015)).

In view of all this precedent, and ever mindful that a within-guidelines term (which, as we've said, this was) may be presumed reasonable, see United States v. Colcord, 90 F.4th 25, 30 (1st Cir. 2024), we see no error, clear or obvious, in the sentencing court's explanation of its low-end sentence. At the hearing, the court said it considered the sentencing factors (and "[s]uch a statement is entitled to some weight," Colón-Cordero, 91 F.4th at 51 (quoting United States v. Clogston, 662 F.3d 588, 592 (1st Cir. 2011))), as well as Fígaro-Benjamín's counsel's argument

and sentencing memo, the government's argument, and Fígaro-Benjamín's allocution. The court went on to lay out some typical identifying details (Fígaro-Benjamín's age (37), education (10th grade), employment history (self-employed shining boats and cleaning boat carpets), and substance use history (none)) before considering the nature of Fígaro-Benjamín's offense. Then the court noted Fígaro-Benjamín's boat trips from Puerto Rico to St. Thomas to transport 267 kilograms of cocaine into Puerto Rico, highlighting that for at least one trip -- the January 2018 voyage -- Fígaro-Benjamín was the Black Wolfpack's captain. Notwithstanding Fígaro-Benjamín's 135-month recommendation, the court levied a sentence of 292 months' imprisonment to "reflect[] the seriousness of the offenses, promote[] respect for the law, protect[] the public from additional crimes by [Fígaro-Benjamín] and address[] the issues of deterrence and punishment." On the Statement of Reasons, the sentencing court submitted "[d]rug quantity and roles."

Like sentences themselves, sentencing explanations live on a spectrum -- and "[j]ust what kind of explanation is needed depends on the context of each individual case." Colón-Cordero, 91 F.4th at 50-51; see also Rita v. United States, 551 U.S. 338, 356 (2007) ("The appropriateness of brevity or length, conciseness or detail, when to write, what to say, depends upon circumstances."). On this record, and particularly viewed under

- 32 -

the exacting plain-error lens, the sentencing court's explanation here passes muster:  It identified the main factors (the volume of drugs moved over the course of the crew's multiple trips, plus the role Fígaro-Benjamín played in the enterprise -- findings of fact we've deemed supportable) driving its (and to repeat) within-guidelines sentencing determination, and, on this record, that is adequate.  See Daoust, 888 F.3d at 576 (explaining the court must identify the main factors animating its sentencing determination); Ubiles-Rosario, 867 F.3d at 293 (providing that if "the record permits a reviewing court to identify both a discrete aspect of an offender's conduct and a connection between that behavior and the aims of sentencing, the sentence is sufficiently explained to pass muster under section 3553(c)" (quoting Vargas-García, 794 F.3d at 166)).[16]

Given our conclusion that Fígaro-Benjamín has not demonstrated that the sentencing court committed error,

---

[16] Now is as good a time as any to note that Fígaro-Benjamín somewhat blurs the lines between the supervisor enhancement factfinding and whether the court adequately explained its decision to apply the enhancement. As to the former, we've already covered why the court's finding that, as a matter of fact, Fígaro-Benjamín was a supervisor is reasonably supported by the record. As to the latter, to the extent that's something he's trying to argue, we note that the application of the enhancement to the GSR calculations is the natural result of the record-supported "he's a supervisor" finding of fact that went into the GSR-calculation stage of the sentencing proceedings. And, as we've explicated, the explanation for the sentence levied within that GSR otherwise clears the plain-error hurdle.

particularly any clear or obvious one, we need not discuss plain error's remaining prongs.

## II.

Our work complete, we <u>affirm</u> the sentence of the district court.